IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CASE NO. 4:16-CV-00084-M

JACK HOWARD COX, SR., *Executor of the Estate of Percy Ray Cox, Deceased*,

Plaintiff,

v.

AGCO Corp. *et al.*,

Defendants.

**OPINION AND ORDER**

This matter is before the court on Defendant Navistar, Inc.'s ("Navistar") Motion for Summary Judgment [DE-328] and Defendant Pneumo Abex LLC's ("Abex") Motion for Summary Judgment [DE-340], Motion to Strike and Exclude Saranac Evidence [DE-323], Motion to Strike Opinions of Dr. Brody [DE-343], and Motion to Strike Opinions of Dr. Holstein [DE-345]. For the reasons stated below, Navistar's and Abex's motions for summary judgment will be granted and the remaining motions by Abex will be denied as moot.

I.  Abbreviated Procedural History

Plaintiff, son and executor of the estate of the deceased Percy Ray Cox (hereinafter "Percy Cox"), brings this diversity, personal-injury action for monetary damages for his father's contraction of an asbestos-related disease allegedly due to Percy Cox's work as an automobile and heavy-equipment mechanic. DE-189 ¶¶ 26, 28(a), 34. Percy Cox was diagnosed with mesothelioma by autopsy in November 2015. *Id.* ¶ 26. The original complaint was filed on June 1, 2016, against more than twenty named defendants [DE-1]. The operative complaint is the second amended complaint, filed on November 16, 2017 [DE-189]. Seven named defendants remain in

1

this litigation, [Joint Status Report, DE-427],[1] with four primary causes of action against each defendant: negligence, breach of implied warranty, willful and wanton conduct supporting punitive damages, and failure to warn, [DE-189 ¶¶ 37-70]. All discovery in this matter closed on September 14, 2018, and all dispositive motions were due to be filed on or before October 15, 2018. Order on Joint Mot. to Amend Scheduling Order, DE-288. This case was reassigned to the undersigned on January 7, 2020. Text Order, DE-428.

Defendants Navistar and Abex have moved the court for summary judgment on all of Plaintiff's claims on one basis: that the Plaintiff has failed to demonstrate the requisite exposure to asbestos products manufactured, sold, or distributed by these particular defendants.

II.     Factual Background

The testimony of two of Percy Cox's sons, Jack and Craig Cox, both of whom spent time and worked alongside Percy Cox as children and through adulthood—one primarily as a mechanic, the other in the parts department—provide the basis for this factual background. The forecast of evidence, in the light most favorable to the Plaintiff, is as follows.[2] Percy Cox founded, owned,

---

[1] Only six defendants are listed in the Joint Status Report. DE-427. The seventh is Defendant Maremont Corporation for whom a Suggestion of Bankruptcy was entered on January 22, 2019, DE-402, serving as a stay of judicial proceedings against the debtor.

[2] The Local Rules state that "[t]he memorandum opposing a motion for summary judgment shall be supported by a separate statement including a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs, and if necessary, additional paragraphs containing a statement of additional material facts as to which the opposing party contends there is a genuine dispute. Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Local Civil Rule 56.1(a)(2). Plaintiff's responses in opposition to the motions for summary judgment discussed herein violate this rule because they do not contain separate statements of material facts with numbers corresponding to Defendants' statements of material facts. *See* DE-371; DE-362. Thus, to the extent that Plaintiff does not oppose any statement of material fact by citing to particular parts of the record or showing that Defendants cannot support their positions based on evidence in the record, the court deems the material facts admitted. *Shinaberry v. Town of*

2

operated, and worked in an automotive and heavy-equipment repair business[3] in Greenville, North Carolina, for approximately five decades from 1946 to the 1990s. J. Cox Dep. 11:17-20; J. Cox Dep. vol. 2, 9:14-25.[4] The business primarily serviced passenger vehicles and pickup trucks, but also occasionally worked on farm equipment and tractors. J. Cox Dep. 147:23-148:5. The business employed anywhere from forty-three to forty-eight people at any given time. *Id.* 154:5-22. The business handled a variety of services but of particular relevance to this suit was the business's work remanufacturing, repairing, and replacing brakes and clutches. This work in particular often involved the scoring, sanding, drilling, and/or grinding of linings. *See generally id.* 18:8-23:25 (brakes); 37:19-43:2 (clutches). This process released dust into the air, *id.*, some of which contained asbestos fibers. DE-189 ¶ 28(a). This air was then inhaled, ingested, or otherwise absorbed by Percy Cox causing him to develop and ultimately die from an asbestos-related disease, mesothelioma, at the age of ninety-four. DE-189 ¶¶ 26, 28(a); J. Cox Dep. 10:10-21.

The business completed approximately two to six brake changes per day and one to two clutch changes per week. J. Cox. Dep. 65:19-24 (brakes); 80:8-19 (clutches). The main supply of new brake shoes used by the business in its work was the business' own remanufactured brakes, followed by new "Bendix" brakes, and then new "Grizzly" brakes. J. Cox Dep. vol. 2, 44:8-45:25 ("And that's two that really stands out."). The business also purchased "EIS," "Raybestos," and

---

*Murfreesboro, N.C.*, No. 2:17-CV-7-D, 2019 WL 5446712, at *1, n.1 (E.D.N.C. Oct. 23, 2019) (following the same procedure).
[3] The business went through name changes over the years and will be referred to herein as "the business".
[4] The Jack and Craig Cox deposition transcripts were repeatedly filed as new exhibits to the briefing associated with the motions for summary judgment. For the sake of citation brevity, the court will not reference the docket entry numbers associated with each transcript above the line but will list them here: J. Cox Dep. appears at DE-329-2, DE-330-1, DE-341-1, DE-342-1, DE-362-1, DE-371-1, DE-379-2; J. Cox Dep., vol. 2 appears at DE-329-4, DE-330-3, DE-341-2, DE-342-2, DE-379-1; and C. Cox Dep. appears at DE-329-3, DE-330-2, DE-341-3, DE-342-3, DE-362-3, DE-371-3, DE-379-3.

"Delco" brakes. C. Cox Dep. 36:11-14. The business had three mechanics dedicated to brake relining, but all had passed away by the time discovery in this action was ongoing. J. Cox Dep. vol. 2, 18:5-19:20. All of the business' records that pre-date 1984 burned in a fire; all of the records that post-date 1984 were shredded once they were seven years old and no longer exist; furthermore, no computerized records for the business exist. C. Cox Dep. 157:1-15. All of the business' transactions were verbal and order forms were not used. *Id.* 109:17-21.

Percy Cox was the owner of the business and was an "old-school[,] . . . hands-on" operator who "would get down and dirty just like the rest of them [i.e. his employees]." *Id.* 33:2-13; J. Cox Dep. 65:8-9. "There was nothing there he didn't work on, really." J. Cox Dep. 240:9-10.

*International Harvester.*[5] The business had a relationship with International Harvester, a company in Greenville that repaired and sold heavy-duty equipment, for as long as Jack Cox worked at the business. *Id.* 237:18-238:8; 239:10-19. Business employees would pick up specialized brakes and clutches from the nearby International Harvester store to be remanufactured as well as repair starters and generators. *Id.* 238:12-23. The manufacturers of the brakes and clutches retrieved from International Harvester were unknown. *Id.* 238:24-239:9. So were the specifications or model numbers for the brakes and clutches. *Id.* 240:19-22. The maintenance history of the individual brakes and clutches worked on were also unknown. J. Cox Dep. vol. 2, 107:22-108:7. International Harvester did market asbestos-containing parts and accessories for farm equipment, including brake and clutch parts. *See generally* International Harvester Parts & Accessories Catalogues, 1966-1970, DE-371-7.

---

[5] For purposes of Navistar's motion for summary judgment, it has conceded that it bears responsibility for International Harvester equipment. DE-330 at 1, n.1.

*Farmall.*[6] Jack Cox personally performed maintenance on Farmall starters, alternators, and generators several times over the course of his employment with the business. J. Cox Dep. vol. 2, 106:3-17. Percy Cox generally would have worked on Farmall equipment as well. *Id.* 104:14-19. Percy Cox would also travel to nearby farms to perform maintenance and repair work on farm equipment, but that likely did not involve brake or clutch work. *Id.* 104:20-105:19.

*Rayloc.* There was a National Automotive Parts Association or "NAPA" store near the business that distributed automotive replacement parts. C. Cox Dep. 34:16-21. The business did approximately $1,500 worth of business with NAPA every month. *Id.* 150:4-16. An unknown portion of this total was spent towards brake shoes. *Id.* 151:3-15. One brand of brakes Craig Cox recalled being available for sale at NAPA and that the business may have purchased was "Rayloc." *Id.* 39:19-40:10. This was the only mention of "Rayloc" brakes during the Jack and Craig Cox depositions:

> Q. Do you recall ever having to buy brake parts or – excuse me –
> brake shoes from, say, the NAPA store across the street?
> A. Sure.
> Q. Were there any brands of brakes that you recall being present –
> A. You know the two –
> Q. – at the NAPA store?
> A. – that stick to mind, I believe we got most of the – we had Grizzly.
> I think Grizzly came from the mom-and-pop, and Blaylock [sic] –
> Blaylock came from NAPA. Is that right?
> Q. No. You tell me.
> A. Rayloc. You're asking me do I know – do –
> Q. Right.
> A. – I remember? I vaguely remember the names of these.

*Id.* Abex was the primary supplier of friction material for brake linings used in Rayloc brakes until the early 1980s, though there were fluctuations over time. *See* B. Frantz Dep. at 34:13-16, DE-362-6 ("Through the 1970s Abex would have provided the vast majority of friction material that

---

[6] For purposes of Navistar's motion for summary judgment, it has conceded that it bears responsibility for Farmall equipment. DE-330 at 1, n.1.

5

Case 4:16-cv-00084-M   Document 434   Filed 06/25/20   Page 5 of 14

Rayloc would have used to reline brakes."); *see also* B. Iwarsson Letter to E. Jones, Oct. 1, 1979, DE-385-3 (expressing disappointment that Abex now only supplies 46% of friction material needs).

III. Analysis

A. Summary Judgment Legal Standard

If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" the court shall grant summary judgment. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations and citations omitted). The court's role at the summary-judgment stage is not "to weigh the evidence and determine the truth of the matter" but instead "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting the Federal Rules of Civil Procedure). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation,

6

the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. It is then "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958).

B. North Carolina Law of Causation in Asbestos Cases

A district court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." *Johnson v. Holiday Inn of Am., Inc.*, 895 F. Supp. 97, 98 (M.D.N.C. 1995); *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (N.C. 1988) ("This Court has consistently adhered to the lex loci rule in tort actions."). Percy Cox's alleged exposure to the Defendants' products occurred in North Carolina, as did the mesothelioma diagnosis. Accordingly, the court will apply North Carolina's substantive law.

The North Carolina Supreme Court has said that a plaintiff in an asbestos case "must demonstrate that he was actually exposed to the alleged offending products. It will not be enough for plaintiff simply to show that various products were shipped to various job sites on which he worked." *Wilder v. Amatex Corp.*, 314 N.C. 550, 553-54, 336 S.E.2d 66, 68 (N.C. 1985). In a similar vein, the Fourth Circuit, in the asbestos context, has held once this actual-exposure threshold requirement is met, "there must be evidence of exposure to a specific product on a *regular* basis *over some extended period of time* in *proximity* to where the plaintiff actually

7

worked." *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986) (emphasis added). This test is often referred to as the "frequency, regularity, and proximity test." *See, e.g., Pace v. Air & Liquid Sys. Corp.*, 642 F. App'x 244, 247 (4th Cir. 2016) (internal quotations omitted). Though the *Lohrmann* case involved Maryland law, the Fourth Circuit found the test to be equally applicable in cases based in North Carolina law. *Jones v. Owens-Corning Fiberglas Corp. & Amchem Prod.*, 69 F.3d 712, 716 n.2 (4th Cir. 1995). Furthermore, though the *Lohrmann* case involved a different asbestos-related disease, asbestosis, "federal courts in North Carolina have routinely applied *Lohrmann*'s 'frequency, regularity, and proximity' test to evaluate proximate causation in asbestos cases, including those involving mesothelioma, arising under North Carolina law." *Connor v. Norfolk S. Ry. Co.*, No. 1:17CV127, 2018 WL 6514842, at *3, n.5 (M.D.N.C. Dec. 11, 2018), *appeal filed* No. 19-1015 (4th Cir. Jan. 4, 2019) (collecting cases); *see also Pace*, 642 F. App'x at 247-48 (applying the *Lohrmann* test in a mesothelioma case under South Carolina tort law). Additionally, alternative liability, market-share liability, and enterprise liability—theories of recovery established to ease certain obstacles to the proof of product identification and legal causation—are not recognized in North Carolina. *See Griffin v. Tenneco Resins, Inc.*, 648 F. Supp. 964, 966-67 (W.D.N.C. 1986) (holding that manufacturer of benzidine congener dyes could not be held liable to plaintiffs seeking to recover for personal injuries or death allegedly arising out of exposure to the dyes based on theories of alternative liability, market share liability, or enterprise liability, rather, defendant manufacturer had to be identified with the specific instrumentality allegedly causing the injury).

The Fourth Circuit has recognized that requiring direct evidence of product identification is unreasonable and that circumstantial evidence can instead be used to establish a plaintiff's regular exposure to a specific product over an extended period of time. *See Roehling v. Nat'l*
8

*Gypsum Co. Gold Bond Bldg. Prods.*, 786 F.2d 1225, 1228-29 (4th Cir. 1986) (finding that a reasonable inference could be drawn to establish that plaintiff was in the same limited area as those witnesses who could specifically identify defendants' products as causing the asbestos dust in that discrete area); *but see Lohrmann*, 782 F.2d at 1163 (holding that invoice evidence, standing alone, was not sufficient to establish that a particular product was a substantial contributing factor where invoices showed only the purchase of asbestos-containing product, but not when or where the product was used). Because the relevant evidence varies according to defendant, the court will address the summary judgment motions separately.

C. Navistar's Motion for Summary Judgment [DE-328]

Navistar's primary argument is a simple one: "the record is devoid of any evidence that [Percy] Cox ever worked with or around products for which Navistar bears responsibility [i.e., International Harvester and Farmall equipment]." DE-330 at 2, 1, n.1. The burden then shifts to the Plaintiff to show that the record contains facts from which a reasonable jury could conclude that Percy Cox was actually exposed to Navistar-attributable asbestos, as required by *Wilder*, and that this exposure occurred with sufficient frequency, regularity, and proximity, to satisfy *Lohrmann*. Through circumstantial testimony from Jack and Craig Cox, Plaintiff argues that Percy Cox was exposed to International Harvester asbestos-containing brakes, this exposure was a substantial factor in causing his mesothelioma and death, and that Navistar had actual knowledge of the dangers of asbestos in its products. *See generally* DE-371. Furthermore, Plaintiff argues, "[t]hat [Navistar] did not personally manufacture the brakes itself does not allow it to escape liability" because changing brakes was required due to ordinary wear and tear and a manufacturer bears responsibility for a defect in a component part incorporated into its finished product. *Id.* at 14-15.

9

For the reasons that follow, the court finds that Plaintiff's argument does not survive summary judgment. Pursuant to *Wilder*, a plaintiff must forecast evidence from which a reasonable jury could conclude that he was actually exposed to asbestos attributable to the defendant. Pursuant to *Lohrmann*, such exposure must occur with the requisite frequency, regularity, and proximity as to the individual plaintiff. In *Harris v. Ajax Boiler, Inc.*, Plaintiff was an insulator's helper who serviced boilers. No. 1:12-cv-00311-MR-DLH, 2014 WL 3101941, at *3 (W.D.N.C. July 7, 2014). This work involved a two-step process of first chipping off old mud from a boiler, which created an asbestos dust, followed by the mixing of Narcolite that was used to re-mud the boilers, which also created an asbestos dust. *Id.* The Plaintiff alleged that the asbestos dust he inhaled during both steps of this process caused his mesothelioma. *Id.* In granting summary judgment in favor of the defendants (successors-in-interest/manufacturers of boilers) the court found Plaintiff's forecast of evidence too speculative. "Assuming for the sake of argument that all boilers Harris serviced did contain asbestos at the time of their manufacture, a fatal gap nevertheless exists in Plaintiff's forecast of facts: whether the mud Harris ultimately chipped out of those boilers was any product placed there by the manufacturer." *Id.* While Harris recalled the manufacturers of the boilers he serviced, he did not know the service history, when the boilers were originally installed or by whom, nor whether any boiler he worked on had previously been serviced. *Id.* The court held that under these circumstances, "the trier of fact would be left to speculate whether the mud Harris chipped out of any boiler contained asbestos at all. Such speculation, however, is an inadequate proxy for admissible facts showing what actually occurred." *Id.*

The record, viewed in the light most favorable to the Plaintiff, shows that the International Harvester company marketed parts and accessories for farm equipment, including brake and clutch parts, in the 1960s and 1970. DE-371-7. The business had a relationship with an International

10

Harvester store in Greenville that both repaired and sold heavy-duty equipment. J. Cox Dep. 237:18-238:8. That store would send brakes and clutches—makes, models, manufacturers, and service history unknown—to the business for repair and remanufacture. *Id.* 238:12-239:9; 240:19-22; J. Cox Dep. vol. 2, 107:22-108:7. The record also shows that Farmall tractors were serviced by the business, particularly for starter, alternator, and generator problems. J. Cox Dep. vol. 2, 106:3-17. A reasonable inference can be drawn that over the course of his decades-long career Percy Cox personally repaired or remanufactured some of the brake and clutch parts sent to the business for repair by the International Harvester store and that he worked on starters, alternators, and generators of Farmall tractors, given that he was "hands-on" and "would get down and dirty just like the rest of them." C. Cox Dep. 33:2-13; J. Cox Dep. 65:8-9.

However, the record does not contain any evidence regarding the specific International Harvester store in Greenville, the nature of the repair work it handled, or the heavy-duty equipment it sold. The record does not contain any evidence regarding whether or not the International Harvester store exclusively dealt in International Harvester-manufactured equipment. Similar to the plaintiff's forecast of evidence in *Harris*, Jack Cox did not know the manufacturers of the brakes and clutches the business repaired for International Harvester, did not know the service history of those products, nor whether any part had been previously repaired and relined by another third party or the business itself.

Plaintiff's assertion that "Navistar's corporate representative admitted that all International Harvester tractors and trucks used asbestos-containing brakes until 1983 or 1984," DE-371 at 15, is insufficient. Although the brakes and clutches repaired by the business came from the International Harvester store, Plaintiff has failed to forecast evidence sufficient to demonstrate that they were manufactured by International Harvester. Given the unknown origin of the brake and

11

clutch products the business was asked to repair, the trier of fact would be left to speculate whether the friction material in brakes and clutches Percy Cox scored, sanded, drilled, and/or grinded contained asbestos at all. Plaintiff's inability to identify the manufacturer of the brakes and clutches Percy Cox serviced in the first instance exposes the gap in the forecast of evidence just as in *Harris*.

To infer that service on the Farmall equipment specifically involved work on brakes and clutches, that these parts contained asbestos fibers, that those fibers were released upon repair, and that those fibers were inhaled by Percy Cox with the requisite frequency, regularity, and proximity would also be pure speculation based upon the limited record before the court, even viewed in the light most favorable to the Plaintiff. Therefore, applying North Carolina law, the court finds that Plaintiff failed to forecast evidence that a reasonable juror, beyond speculation, could infer that the brakes and clutches retrieved from International Harvester were manufactured by International Harvester or that Percy Cox worked on Farmall tractor brakes and clutches and that all such products contained asbestos. Even assuming that Percy Cox had some interaction with International Harvester or Farmall asbestos-containing brakes and clutches, the presented testimony offers no evidence from which one could determine the frequency, regularity, or proximity of that exposure. The evidence is therefore insufficient to satisfy either *Wilder* or *Lohrmann*; accordingly, the court will grant Navistar's motion for summary judgment.

D. Abex's Motion for Summary Judgment [DE-340]

Similar to Navistar, Abex contends that "[t]here is no evidence that [Percy Cox] was ever exposed to any Abex asbestos-containing product." DE-342 at 1. Specifically, "[n]o witness testified to using an Abex product. No witness has placed any Abex product at [the business]. [The business] does not appear on any Abex customer list. The Greenville NAPA store does not appear on any Abex customer list." *Id.* at 5. The burden then shifts to the Plaintiff to show that the record

12

contains facts from which a reasonable jury could conclude that Percy Cox was actually exposed to Abex-attributable asbestos, as required by *Wilder*, and that this exposure occurred with sufficient frequency, regularity, and proximity, to satisfy *Lohrmann*. Plaintiff argues "Abex is liable for [Percy] Cox's exposure to the asbestos-containing linings of Rayloc brakes purchased from the NAPA store." DE-362 at 1. Through circumstantial testimony from Craig Cox stating that the business purchased Rayloc brand brakes from the NAPA store across the street, Plaintiff contends that Percy Cox was exposed to Abex's asbestos-containing friction material and that this exposure was a substantial factor in causing his mesothelioma and death. *Id.* at 4-8.

The record, viewed in the light most favorable to the Plaintiff, shows that the business purchased automotive replacement parts from the nearby NAPA store on a regular basis and that one brake brand the store carried was "Rayloc." C. Cox Dep. 39:19-40:10. The Rayloc brand was not one of the brands of brake products Jack Cox specifically recalled, nor one of the two most frequently used after the business' own remanufactured brakes, but was one of the brands available for purchase at NAPA. *Id.*; J. Cox Dep. vol. 2, 44:8-45:25. A reasonable inference can be drawn that brake products were one of the categories of items purchased from the NAPA store, considering that $1500 worth of parts were purchased by the business every month and the business in turn performed between two and six brake changes per day and furthermore that the business may have purchased Rayloc brakes on occasion. However, much more speculation and conjecture is required to connect Abex to Plaintiff's complained-of injury. First and most critical is the inference that Rayloc brakes purchased by the business from the NAPA store specifically contained friction material supplied by Abex. While Abex was Rayloc's primary supplier of friction material, B. Frantz Dep. at 34:13-16, DE-362-6, it was not Rayloc's only supplier and North Carolina does not recognize market-share liability, *Griffin*, 648 F. Supp. at 966-67. Second

13

is the inference that Percy Cox in particular worked with or near Rayloc brakes that contained Abex-supplied friction material. Third is the inference that the work on the brakes released friction material into the air through the scoring, sanding, drilling, and/or grinding process. Fourth, that the friction material released into the air contained asbestos fibers. Fifth, that those Abex-supplied, asbestos-containing friction fibers were inhaled by Percy Cox with the requisite frequency, regularity, and proximity to establish Abex friction material as a substantial contributing factor to Percy Cox's mesothelioma. This string of inferential leaps in increasingly tenuous. Ultimately Plaintiff has failed to forecast evidence from which a reasonable jury could conclude that Percy Cox was actually exposed to Abex-attributable asbestos, as required by *Wilder*, and that this exposure, if it occurred, happened with sufficient frequency, regularity, and proximity, to satisfy the *Lohrmann* test. Accordingly, the court will grant Abex's motion for summary judgment.

IV.     Conclusion

For the reasons outlined above, the court GRANTS Navistar's Motion for Summary Judgment [DE-328] and Abex's Motion for Summary Judgment [DE-340]. Plaintiff's claims against Navistar and Abex are hereby DISMISSED. It is further ordered that Abex's remaining motions are DENIED as moot: Motion to Strike and Exclude Saranac Evidence [DE-323], Motion to Strike Opinions of Dr. Brody [DE-343], and Motion to Strike Opinions of Dr. Holstein [DE-345]. For the foregoing reasons, Navistar and Abex are terminated from this suit and are relieved from participating in the telephonic status conference scheduled to take place on June 26, 2020, pursuant to this court's text order issued on June 9, 2020.

SO ORDERED this the 25th day of June, 2020.

RICHARD E. MYERS II
U.S. DISTRICT COURT JUDGE